Thank you, Mr. Chief Justice, and may it please the Court. This case involves a vaccine designed in the 1940s. It was administered to Hannah Bresewitz in 1992, some 30 years after scientists discovered a safer way to design the pertussis component of the DDP vaccine. The Third Circuit held that the Bresewitzes could not pursue a design defect claim under State law, invoking the preemption principle in claiming that the Vaccine Act of 1986 preempted the Bresewitzes' State law claim. That holding is in error for three reasons. First, the Court overlooked the numerous provisions of the Act protecting manufacturers from liability, but it did not expressly preempt design defect claims. Second, the Court misconstrued the word unavoidable in Section 22b-1's Federal law defense. And third, the Court adopted a policy that exposes children to unnecessary safety risks. With respect to the first reason, in the 1986 Act, Congress created a program, the Vaccine Program, that was funded by surcharges on the vaccines that users used, and out of that fund designed a program to pay compensation to persons who were injured by vaccine-related acts. Congress also provided a mechanism for exhaustion through the Vaccine Court program before a person claiming injury could pursue a State law cause of action. In creating Federal law defenses to the State law that was designed to govern such actions, Congress established certain defenses. But all of those defenses apply on a case-by-case basis. There are no absolute provisions that preclude a State law claim. The Third Circuit misunderstood that basic principle. The defenses that the Vaccine Act created for manufacturers include such things as a regulatory compliance defense for failure to warn claims, a learned intermediary doctrine that's instituted at a national level, the imposition of comment by a state law claim. Roberts. What is the point you're trying to make, that because there are a whole bunch of provisions designed to help manufacturers that this one can't possibly also be designed to help manufacturers? My point is that when one looks at the specific language of 22b-1, against the backdrop of these other provisions, it's clear what Congress was intending was to enact a national defense, but not to displace State law completely. And the question presents whether, on a case-by-case basis, the design-defect claims that have been brought by the Bruisewitzes are displaced as a matter of law. I would have thought the argument would go the other way, that because they set up a compensation scheme, that was a good sign that they didn't want to allow State law claims. And if one looks, Mr. Chief Justice, at Sections 21, 22, and 23 of the Act, what 21 provides is that the claimant can elect not to accept the vaccine court judgment. Section 22 provides the standards of responsibility, and Section 23 provides the mechanisms for trial of the State law claim. And 23e provides that the evidence of the vaccine table and what happens in the vaccine court shall not be admissible in the State law claim. Section 22b-1 refers to side effects that were unavoidable, even though the vaccine was properly prepared and was accompanied by proper directions and warnings. If the term unavoidable was intended to carry its ordinary meaning, what need was there for the rest of that language, even though the vaccine was properly prepared and was accompanied by proper directions and warnings? If it was improperly prepared or didn't have proper directions and warnings, then the side effects are avoidable. So that language is surplusage, isn't it, if unavoidable really means unavoidable? What Congress was intending to do, Justice Alito, was with the word unavoidable to use a word that had a settled meaning at the common law. And that settled meaning referred to the design of the product in light of the current state of scientific knowledge that drew directly from comment K, the section 402a of the Restatement of Torts. And in comment K, which tracked the structure of the restatement provision itself, the general rule for the restatement was strict liability for dangerous products, quote, although the drug is properly manufactured or properly warned against. But isn't it true that at the time there was a distinct minority view that you could not recover for design defects for vaccines? There certainly was a debate. The majority view, however, was to adopt comment K as a defense to strict liability claims on a case-by-case basis. And the cases that we've set forth, I think, illustrate that. Even the cases that the other side cites, several of them had been overruled by the time the 1986 Act took effect. And there was a decided shift in favor of a case-by-case application of comment K. And in the 1987 report, Congress made very clear it intended to preserve that case-by-case approach. That is set forth at page 50 of our brief, Justice Alito. So when one looks at both the words that Congress used in 22b1, the debates that occurred, and the committee reports that explained what Congress is intending here, the we believe the intent is unmistakably clear to adopt comment K as a defense to a case-by-case application of comment K. Scalia, but you haven't really answered Justice Alito's question as to why the later language is not surplus. If, indeed, it bears the technical meaning you say that it bears, that later language is surplus. It's not surplus if one reads comment K and understands what the drafters there were intending to get at, which was, if, based on current scientific knowledge, the risks are unavoidably unsafe, meaning there's no way in science we can design a safer product, there will be a defense to a claim of strict liability unless, or provided that, the product is properly manufactured and warned against. This was a proviso that was intended to ensure that the focus be kept on the unavoidable and unsafe aspects of the design of the vaccine. Now, the other side's view takes other words of 22b-1 and renders them surplusage. And I'm looking now at page 19a of our reply brief where we've set forth a statutory language if you want to follow along here. What the other side's view is that after the word if, following the date October 1, 1988, I'm at page 19a of the reply brief, the addendum, under their view, all of the words that follow the word if and through even though become surplusage, because under their reading, the manufacturer is relieved of reliability if, quote, the vaccine was properly prepared and was accompanied by proper directions and warnings, and renders the entire concept of unavoidability surplusage. So our view is that what these words do is that under their view after the word if, the phrase, the injury or death resulted from side effects that were unavoidable even though is surplusage, because in their view of the statute, Congress created a complete exoneration from liability if the vaccine was properly prepared and rendered if the vaccine was properly prepared and was accompanied by proper warnings. They take the concept of unavoidability completely out of the statute. And the word unavoidable had a settled meaning. There were numerous cases that had construed that meaning in light of the 20-year history of Restatement Section 402a. So the government is urging that unavoidable means unavoidable in the vaccine. And that has gained FDA approval. Frederick, that position is incorrect, and there is empirical evidence indicating that the manufacturers, let alone Mr. Johnson, testified that the problem with the 86 version of the statute was that it allowed for design defect claims to go forward, and he urged there to be a regulatory compliance defense. Roberts, so you're asking us to interpret this statute in light of his testimony at a hearing? Frederick, what I'm saying is that Congress had choices, and one of the choices was to adopt the regulatory compliance defense for design defect claims, and it chose not to do that. Roberts, it seems to me the language supports the reading Justice Ginsburg has just suggested, or the government suggests, with the use of the word the. It says the effects were unavoidable even though the vaccine was properly prepared. Your position is, well, the question is whether unavoidable if you could have prepared a different vaccine. But this says unavoidable even though the vaccine was properly prepared. Frederick, and it's preceded by the word if, Mr. Chief Justice, and if suggests that. Roberts, I don't see if. It's right after the date 1988. If. If the injury resulted from side effects. So it is looking on a case-by-case basis in that context whether the vaccine created the injury or side effect that is being complained of. Mr. Frederick, I have this problem with your interpretation. As has been said, the government interprets unavoidable to mean unavoidable with respect to the vaccine that has been approved. If it doesn't mean that, if it simply means unavoidable with some other vaccine, well, you could always avoid them if you have a vaccine that is significantly less effective. What other vaccine are you comparing it with? Justice Scalia, let me try to clear this up in this way. All these vaccines are approved by the FDA. And the question is whether you give a presumption of design correctness for all time based on the FDA's approval of that vaccine. This vaccine was approved by the FDA. Well, I understand, but the plaintiff comes in and says, look, you could have, you know, eliminated this, this, and this, and these side effects would not occur. Of course, the vaccine would only be effective in 75 percent of the cases, but nonetheless it was avoidable. And that's why the concept of unavoidability as a defense always rested on the current state of scientific knowledge. In the 1960s, letterly science was used. Well, that doesn't answer my question. I acknowledge it rests on current scientific knowledge. But current scientific knowledge would enable you to design a drug that does not have these side effects, even though it's significantly less effective. And there's no criterion as to how much less effective it has to be to qualify and so forth. Whereas the government's interpretation of the word ties it to a particular vaccine. Justice Scalia, the way these cases were construed, and we've cited them in our reply brief, the standard was whether or not it was as safe as a feasible alternative, but was — sorry, as efficacious, but safer as a feasible alternative. That's how the Court's — the State court's interpretation of it was. It has to be just as effective. It has to be efficacious. That's correct. Just as effective. Sure. I'll concede that point. The problem here was that an efficacious design existed as of the 1960s, and the internal documents indicated that letterly — I keep saying that, but didn't I understand correctly that that drug was withdrawn from the Japanese market in which it had originally been? No. Let me clarify. There are two theories here by which there was a design defect claim. One concerned a product by Eli Lilly called Trisulgin. That was a split-cell vaccine that was developed and sold in the 1960s. It was demonstrated to have far less serious effects for encephalopathy and other residual seizure disorders and problems. Was it proven that it was as effective? Yes, it was. And it had 65 percent of the market. And could it be used for all five — there are five inoculations in this series. That's correct. But one of them was not approved for the first three. That's the second one, for Justice Sotomayor. This was an acellular technique that had been studied in the United States in the 1950s and eventually was developed by the Japanese in the 1980s. That acellular technique was eventually approved by the FDA in the mid-1990s and is now common in all of the three-part DDAP vaccines that are currently on the market. Our point is that the scientists by letterly knew about that acellular technique. They were beginning to do tests, but they didn't aggressively do it for economic reasons. And that has never been the case. If there is a safer alternative, it must be pursued regardless of cost? No. There is a reasonableness standard. The standard of due care that State law and tort has always had is what is a reasonable manufacturer due in same or similar circumstances. But that's a question ultimately of fact, whether or not the economics were safe. Kennedy, the law seems to at least qualify section — comment K. Justice Kennedy, that was the whole design of the vaccine program. Because if you channeled most claims into something that the manufacturers didn't have to defend against or pay the judgments of, the thought was that the vast, vast majority of people would never go to State court. And it would only be in those rare circumstances, like the problem we have here where the vaccine court awards nothing, that the Brusewitzes even had to go to State court. Had they filed their claim a month earlier when residual seizure disorder was still on the vaccine table, we wouldn't be here. Why was it taken off? There was a debate in the scientific community. The Institute of Medicine believed that residual seizure disorder was medically proved to be a causative factor from the pertussis component of the DDP. There was a disagreement by folks in the Secretary of Health and Human Services as to whether or not that was sufficient to justify legal cause. And so didn't the special master find in the compensation proceeding that causation had not been proved? Yes. And it was a proceeding, Justice Ginsburg, that had allowed for no discovery against the drug manufacturer. So you say that in court you could prove causation because you have discovery, although you couldn't prove it before the special master because discovery was very limited? That's our submission. And that was the design that Congress intended. That's why what happens in the vaccine court under Section 23e as a matter of law is inadmissible in a subsequent State court action. Breyer. And can you add to that? Maybe this is a good point, but I would like to know what your response is. I'm not asking it in either a hostile or friendly way. The assume for the moment that the language I cannot find clear one way or the other. So I think it's ambiguous. At that point, what is your response on that assumption to this brief on the other side from the American Academy of Pediatrics and 21 other physician and public health organizations? What the pediatricians here say is that if you win, we're turning this over to judges and juries instead of the FDA and other specialized agencies, that the result could as well be driving certain vaccines from the market, and basically a lot of children will die. And that's their claim. And I think that their legal argument there is that wasn't Congress's purpose. Congress's purpose was the contrary. So leaving the language out of it, I would like you to respond to what I'd call that purpose-related, fact-related argument by these particular people. If I may, let me make two points, Justice Breyer, the legal point and the policy point. The legal point is this Court's case is made clear that there is a clear statement principle. Before Congress is presumed to have displaced State law, it must act with a clear statement, and that's true in the Eleventh Amendment context as well as the preemption context. So if you conclude there's ambiguity, we should win. Breyer, there's another case on that where we're going to have to go into, which is does that mean every bit of it has to be clear? Does it mean the intent has to be clear? That's a complicated area, but I'll put that aside for the moment. Here, 22a answers that question as a matter of law because it says State law provides the general rule. So now that's the legal point. The policy point is that by channeling the vast majority, and the SG's brief says 99 percent of the people who go through vaccine court accept the judgment of the vaccine court. And on the First Circuit, the Schaeffer decision, which you wrote, Justice Breyer, said that even in the instances in which people lose in the vaccine court, they may regard the hurdles and obstacles of the State court process to be so great that they don't bother to try. It's difficult to win these kinds of cases in State court. Sotomayor, explain why. Because proving causation and proving the availability based on science of an alternative design is not something that is a relatively easy thing to do. Breyer, but that's why I asked the question. Frankly, if I see the Academy of Pediatrics telling me one thing and I, in an earlier case, wrote the other thing, I do tend to think I could have been wrong. And that's why I'm asking you, is that the best you can find on the other side, namely something I once wrote in a case, or are there other things? It happened in the moment to come to mind, Justice Breyer. The point that I want to make is that the threat of liability is only a realistic one if there's a threat that there's actually going to be payment at the end. And plaintiffs do not bring cases to lose. They bring cases if they have a reasonable prospect of winning based on what the evidence would show a design defect to be. And so when Congress set up this system and it exonerated the vaccine makers of 99 percent of all cases that are going to go through the system claiming defects or problems, if you ask manufacturers around the country that you get a special defense against punitive damages, you get a regulatory compliance defense for failure to warn, you have to have a trifurcated proceeding, and you're not going to have to pay damages or defend the actions 99 percent of the time, most manufacturers in the United States would take that bargain. And so the question doesn't take too many $60 million verdicts to make you come out on the other side of your calculus.  out on the other side of your calculus. And that's why, going back to the wording of the statute, Mr. Chief Justice, in Section 23 where Congress said for someone who had elected not to accept the judgment in 21, you get to go to State court and try to prove your claim. Ginsburg Anyone could go to State. I mean, somebody who won in the vaccine court could go to court on the argument that the amount was insufficient, the amount of the compensation. There's no foreclosure of anyone to come to court. Is that right? That's correct. But you have to fight through the defenses that Congress erected in 22b1, b2, and c, which are quite difficult defenses to prove. Alito What would happen if the drug manufacturer sought FDA approval of an alternative vaccine and the injury occurred during the period while that was under consideration by the FDA? That's just too bad? A harder case, but not one that couldn't be proved under State law. The negligence inquiry would look into whether or not a reasonable manufacturer would have tried earlier and more aggressively to obtain FDA approval. Here, we think we can meet that standard because we had a drug that was on the market, the split-cell Trisulgin, that was proved to be safer and just as efficacious, and it had been on the market until Wyeth took it off, after Wyeth concluded that when it purchased the rights from Eli Lilly, it couldn't manufacture the vaccine Trisulgin in a way that it gave it the profit stream that it wanted. Ginsburg When it was, when Trisulgin was owned by Lilly, you said that it was approved and marketed. Was that one available for all five inoculations? Frederick Yes. Yes, Justice Ginsburg. That was used for all through the series for children's vaccination for DDP. And the problem here with the other side's approach fundamentally is that not only does it render part of 22B1 surplusage and not only does it ignore the many benefits that manufacturers got, but at the end of the day, it allows for an exoneration from liability even for manufacturers who know there is a safer design available. And that fundamentally is something Congress never would have imagined, that manufacturers would invoke an immunity from suit even when they knew there was a safer way to design the vaccine. Kennedy Does the Secretary have the authority to withdraw certification on the ground that it's no longer safe, pure, and potent? Frederick Yes, Justice Kennedy, there is a — Kennedy So you're assuming that the manufacturer knows something that the Secretary doesn't? Frederick No. Our submission, Justice Kennedy, is that for many vaccines there is no safer alternative and there could be no design defect claim. But for those instances in which there is a safer alternative, the burden under State law is for the manufacturer to act reasonably in pursuing the safer design, if that is available. It's not — there is no provision in the FDA regulations or under statute for the FDA to engage in a comparative safety analysis. Sotomayor Is there any provision in the regulations that require a manufacturer to withdraw a drug earlier than when the FDA tells them to? Frederick Not that I'm aware of. Sotomayor So this immunity would come along until they go to the FDA and say, well, we've gotten enough incidents to prove our — Frederick That's correct. And this very vaccine, Justice Sotomayor, was taken off the market in 1998. And the product that Wyeth used as the substitute for it says in its package insert, this is a safer vaccine than the tri-immunol that we've taken off the market. Roberts But I'm not sure that in most cases you're going to be able to tell immediately you're marketing one vaccine and something else is either being tested or about to be approved or is on the market, that that's safer, particularly since you have to look not only at whatever injury mortality rates, but also efficaciousness or efficiency, I guess, in terms of the vaccines. You don't know right away. Somebody comes in, here's a different vaccine. Your vaccine causes one death every 10,000 doses or whatever it is. The other says, this is better. It's one death every 12,000 doses. You say, well, but ours is more efficient in stopping the vaccine. Well, how much more efficient? Well, it depends on the judgment of a jury. Frederick And the manufacturers win that case, probably, Mr. Chief Justice. I mean, it's a political matter. Kennedy But you assume that there's no cost or burden to the manufacturers to defend these suits, to assess settlement offers. This is a tremendous expense. Frederick Only if you accept the proposition — Kennedy — that the manufacturer has to settle a meritorious case. We all know that. Frederick Yes. But, Justice Kennedy, that's after an exhaustion process through which they've gone through the vaccine program, and the person is dissatisfied with the remedy that's provided. So in these vast majority of cases, unlike drug cases, where there's no channeling mechanism, here the vaccine fund is designed to take care of the vast, vast, vast majority of those kinds of claims. And it's only in those rare circumstances where there would be a State lawsuit. If I could reserve the balance of my time. Roberts Thank you, Mr. Frederick. Ms. Sullivan. Sullivan Mr. Chief Justice, and may it please the Court, Congress enacted the National Childhood Vaccine Injury Act against the backdrop of a wave of tort litigation that threatened to drive manufacturers out of the business of providing the vaccine. Sotomayor So why didn't they make the vaccine court exclusive? There's plenty of administrative systems that may preclude State law actions altogether and place you in administrative proceedings. So if their intent was to drive out State lawsuits, why not do that? Sullivan Because, Justice Sotomayor, the kind of lawsuits that caused Congress concern were the very kind of lawsuits that are expressly preempted by 22b1, and that is design defect claims, which have the exact problem that was just being discussed. For a design defect claim, as Justice Scalia pointed out, the challenge that is brought to the vaccine that was approved by the FDA can be challenged as less safe than some alternative vaccine bounded only by the imagination of the experts. It was those design defect claims that were the problem. Sotomayor So have they taken care of that with Dobit? I mean, won't most of these cases get resolved on a motion for summary judgment? Sullivan Not design defect claims, Your Honor. Just to go back to 1986 and what the crisis was, as the 1986 House report makes clear, the manufacturers were being driven out of the vaccine business, imperiling the nation's design — vaccine supply by design defect claims that did survive summary judgment and that did lead to the danger, as Justice Kennedy pointed out, of settlements. The complaint about the — Sotomayor So point me to, in the FDA regulations or law, where the FDA, in giving a license to or permitting a new vaccine, actually looks at whether that vaccine is the most efficacious way with the least serious harm to the population. Is there a regulation that requires that judgment by them before they issue permission to market? Sullivan There is not, Justice Sotomayor. What the FDA is empowered by regulation to decide under the Food, Drug, and Cosmetic Act is whether a vaccine is safe and efficacious. Sotomayor All right. Then what is the motivation? If there's no — there's no approval mechanism for the FDA to look at that issue, what's the motivation for manufacturers to voluntarily remove a drug that is causing harm to the public before the FDA acts? If they're completely immune under your reading of this preemption statute, what motivates them to act more quickly? Sullivan The Act itself, Section 27 of the Act. Let me just go back and describe what Congress did in 1986. It said we have a crisis and it created three things to solve the crisis. A preemption provision that said let's end these design defect claims that are causing the problem. Let's provide compensation. Ginsburg If Congress had wanted to do that, they could have said simply that no vaccine manufacturer may be held civilly liable if the vaccine is properly prepared and accompanied by proper directions and adequate warnings. That would have been the simplest statement. Congress didn't make that statement. They were asked to amend the statute to make that statement, and they didn't. I mean, if you wanted to make it clear that there's no design defect liability, then say that. No civil liability unless inadequately improperly prepared, improper directions or warnings. The language that they used is certainly, to say the least, confusing. This unavoidable, side effects that were unavoidable. Well, why did they need to put that in there if what they were concerned with was to cut out liability for design defects? Kagan Justice Ginsburg, let's go back to the text and read the two clauses together. And our main point here is, as Justice Alito and Justice Scalia have already pointed out, the Petitioners rendered the even though clause surplusage. We read the two clauses together, and let's read them together against the backdrop of the three kinds of product liability claims that could be brought, design defect, manufacturing defect, and failure to warn. The statute references two out of the three. And we believe that, and the government believes, that the reason that was done was to say that the third omitted kind of claim, design defect claims, were preempted. The two that were allowed, and, Justice Sotomayor, this is what makes it different from State pure administrative schemes, this does preempt design defect claims, the omitted claim, it allows manufacturing defect claims, and it allows warning claims subject to the presumption in 22b2, limited to the warning claims. Kennedy And under your view, when does the manufacturer have to come forward and acknowledge that there is a defect in the design? Kagan Well, Justice Kennedy, the manufacturer is subject to ongoing reporting requirements under Section 28 of the statute. And I think that if you think there is ambiguity in the text, as Justice Breyer suggests, we can go to the structure of the statute. And let me just mention a number of features of the statute. Sotomayor Could you please just answer that question? What is the motivation for the manufacturer to either continuing the testing of their product and voluntarily stopping it if a better design has been found by someone else, or even an inducement for them to find a better design if a competitor comes around? Because I don't see why they should stop until they've caused as many injuries as they need to before the FDA says stop. What's the inducement for them to do it voluntarily? Kagan First of all, Justice Sotomayor, Justice Kennedy is correct, the FDA can order removal from the market. Sotomayor I don't ask about the FDA, it's the manufacturer's motivation. Kagan And, Justice Sotomayor, the reason why the FDA has never had to use that nuclear option is that it works closely with manufacturers long before it needs to be used. And that's because of the rest of the structure of the Act. I'd like to focus on what Congress did in 86 in addition to Roberts Well, before you get to that, I think you're saying that the answer to Justice Sotomayor's question is nothing. Manufacturers have no reason to take the vaccine off the market until the FDA tells them to. Kagan That's not correct, Your Honor. So the Section 27, Section 27 distinguishes vaccines from other drugs. Section 27 says that the Secretary of Health and Human Services shall, shall have an affirmative mandate to promote safer vaccines and to reduce the number of side effects. And the Vaccine Act didn't just eliminate design defects, but they overstood Sotomayor But if the manufacturer is slow or remiss or negligent or willful in not giving the information to the government, there's nothing the injured person can do. There is still complete preemption under your view. Kagan Of design defect claims, Justice Kennedy, but not of warning claims. And it will — there are grave consequences if a manufacturer withholds knowledge of adverse effects from the FDA. Section 22B2 — Sotomayor Does the victim of that withholding have a private cause of action? I don't see anything in this that would give — Kagan There is not a freestanding cause of action, but if you look at 22B2, you see that the manufacturer will lose his — lose its presumption that its warnings were correct. It will be subject to warning suits in State court if it withholds information from the FDA without the benefit of the presumption. And if you look at 22 — Ginsburg But warning — warning, Ms. Sullivan, the warning claims, the manufacturing claims, those are always avoidable. Kagan Always avoidable, exactly, Your Honor. But so what can be — the only thing that can be unavoidable is the design defect. Sullivan That's exactly right, Your Honor, and that's how the text makes sense. To go back to the text, the text says there are two kinds of avoidable side effects, side effects that come from improper preparation. Well, of course, the manufacturer can avoid those. It can prepare the vaccine better without contaminants. And it can avoid warning defects by changing the warning. Kennedy Well, the warning doesn't have to say, warning, we could make something better if we wanted to. Sullivan It does not. That's correct, Your Honor. That's why — Sotomayor Or there is something better on the market than this that won't cause that. Sullivan But, look, Mr. Frederick has told a story that perhaps has misled the Court into thinking that there was a safer vaccine in the 1980s. There was not. And just to be — just to tell the story of a success in the way that FDA worked with the scientific community and the national government worked with manufacturers to produce a safer vaccine. It was the Federal — Ginsburg Well, can you — can we be concrete and concentrate on this Tri-Slogan, which, according to Mr. Frederick, Eli was producing and it was available for all five inoculations, and then Wyatt bought it, and then — Sullivan Justice Ginsburg, Tri-Slogan was a split-cell vaccine. It was manufactured and produced by Lilly in the — in the 60s and withdrawn in the 70s. But Mr. Frederick is incorrect that the government ever deemed it as effective and safer than the whole-cell vaccine, Tri-Immunol, that was administered in this case. And if I could refer, Your Honor, to page 19 of the Respondent's brief, we cite to 50 Federal Register, 51.051 and 52. That's where the FDA specifically determined that Tri-Slogan was not safer, was not safer than Tri-Immunol with respect to seizure disorders or other severe effects. It simply had — it may have involved less local effects, like fevers and rashes. So there was never any government determination that Tri-Slogan was safer. And, in fact, Tri-Slogan came off the market. Why? Because Section 27 worked. The Federal government worked to promote safer vaccine. Breyer, How does it do that? Look, I think the — a difficulty I have is this. Imagine vaccine X saves 10,000 lives, but inevitably 20 children will be killed. All right? That's inevitable at time period 1. Five years passes. The manufacturer now realizes he could save three of those five people. All right? Is there anything in the law that requires him to tell the FDA that that is so?  All right. Then if there is nothing that requires him to tell the FDA what comes along, what I think your opponent is saying is at that moment it is no longer an unavoidable harm. And there is nothing in this statute that says that unavoidable-ish harms are — that avoidable harms are taken away from the courts. So what is your response to that? He's saying all the unavoidable ones are taken away, but not the avoidable ones. And now we have an example of where they've — okay? So what is your response to that? That unavoidable in the statute is a term of art, and to the extent that comment K is relevant at all, Mr. Frederick says, oh, Congress was adopting comment K, the majority view. Well, first, there was not a majority view. You want to read it specially to mean unavoidable and avoidable. Let's assume you're right about that. Let's assume that — or at least it's ambiguous. If that's so, then what's your response to the question I raised before? That is that he says that if you allow judges and juries to decide only the question of avoidability, there will not be the harms that the childhood pediatricians thought there would be, because most people will go to the court — to the vaccine court anyway. There are very few such cases, and there will not be enough liability to drive manufacturers from the market. Well, you heard him respond to that. What's your response to that? First, there will be enough liability to drive manufacturers from the market. And let me correct some things that Mr. Frederick said that were not true. The vaccine court — 99 percent of those who receive monetary judgments in vaccine courts, the administrative no-fault system, do accept their award. But what Congress was concerned about was those who lose in the administrative system and then go take their second bite at the apple in State court, where, as has been mentioned, they're not bound by any findings in the vaccine court. The 23E says — Just a minor point, but I thought if you went into the vaccine court, you had to sign something saying you weren't going to go into a tort case. I'm wrong about that. No, you go into vaccine court, and there is an exhaustion requirement. 22B1 must add something to the exhaustion requirement. We say it adds a preemption provision. But you can elect at the end to take the judgment or not. Those who get money in vaccine court, 99 percent take it. What we're worried about is the 64 percent who lose in vaccine court. What do those 64 percent do now? What's the percentage of those people that actually go into court now? I can't answer that, Your Honor. Is that because, whatever the percentage is, proving causation is never easy? That's true, Your Honor. For a non-listed — But there are 5,000 claimants in vaccine court now who claim there's a relationship between the mumps, measles, and rubella vaccine and autism. They have lost all six test cases. And when the individual cases are resolved, that is 5,000 potential claimants in state court. Congress was worried about episodic waves of fear about vaccines leading to future litigation. They took care of existing claimants with vaccine injuries back in 1986 with the compensation system. The reason they put in 22B1 was to prevent future litigation in state court where manufacturers could be driven from the market by the fear of liability that had, in 1986, involved the withdrawal of insurance, the escalation of insurance costs, the withdrawal of one manufacturer from a vaccine market. And today there are very few vaccine manufacturers, and the risk to the vaccine supply on which the nation's protection from contagious disease depends, depends upon the existence of that stable supply of vaccines. Ginsburg. If Congress was so clear as to describing it, then why didn't it adopt the provision that said failure to develop a safer vaccine would not be grounds for liability? Your Honor, Justice Ginsburg, I think you have to look to the rest of the structure of the Act to see what Congress did here. It did three things. It made vaccines quite different from other drugs. And this is not a situation where the FDA has to monitor 11,000 drugs, of which it wouldn't even care if they came off the market. Government doesn't care if the proposal was directed to vaccines. If failure to develop a safer vaccine would not be grounds for liability, and Congress didn't enact that. Your Honor, Congress enacted a preemption provision that we think within the four corners of the provision of 22b1 preempts design defects. It has a carve-out for the two kinds of suits that are allowed, manufacturer and warning defects. The clear holding of the rest of the text is that design defect claims are precluded. Compensation makes sure that people who do have injuries from vaccines are taken care of. The rest of the structure of the Act injects the federal government into driving the vaccine development process in a way that it does not for other drugs. Congress wants people to take vaccines. It wants us to inoculate all our children. It wants us to have compensation to assure people who are injured that they can get some money to take care of their children's disabilities. But Congress wanted to make sure that it was driving, that the federal government, the FDA, the Centers for Disease Control, together with the NIH, together with task forces, were driving research to make safer vaccines. Sotomayor, you're making an assumption that has a flawed premise, which is that their only concern was protecting the manufacturers. Not at all, Your Honor. It couldn't have been, because they could not have been. They compensated victims. Not only did they compensate victims, but they permitted victims to go into State court. So it can't be that we need to. Kagan For manufacturing and warning claims. Justice Sotomayor. Sotomayor, that's your assumption. My point is that if we're talking about what the purpose was, you can't assume that the purpose was. Kagan Two purposes, compensation and the protection of the vaccine supply. Justice Sotomayor, the clearest way I can tell you that. Sotomayor So why what you're suggesting is there's no compensation for an injury that was avoidable in its normal sense, which is if this drug had not been sold, and another drug had been used, the person would have avoided their injury. Kagan Well, there's no such drug here. Acellular vaccine was not approved by the FDA for use in infants under 2 until 1996. It was approved for children over 2 in 1991. That's because in this country we require clinical studies that weren't required in Japan a decade earlier to make sure that drugs are safe. Sotomayor Sounds to me that you're going to win on summary judgment. I don't see, I do understand the cost of litigation. It can be very, very onerous. So I'm not trying to minimize it, but I do think that there's a whole lot of hurdles in place before a plaintiff wins on one of these claims. Kagan Justice Sotomayor, manufacturing claims and warning claims are susceptible to summary judgment. Design defect claims are not in the same way. You're shadow boxing against an infinite number of theories about how there could have been a safer vaccine. But the clearest way I can say why Mr. Frederick's interpretation can't be right, if you concede at least one purpose was to protect manufacturers, to protect the vaccine supply in addition to compensating the victims, Mr. Frederick's reading of 22B1 does not serve that purpose. He reads 22B1 to leave manufacturers in the exact same place after the act that they were before, go to state court, try to show that there was no safer alternative because they set up this whole compensation scheme where everybody agrees most were going. I mean, the manufacturers got this compensation scheme, which took most of the cases out of state court. So to say they were left just like they were before, before they were exposed to all these claims, now only to a very small part of them. That's not quite right, Justice Ginsburg. The Act allows all losers in vaccine court to go to state court. There are 5,000 cases. Yes, I got that answer from Mr. Frederick before, but most of them don't, because it's cheaper, faster, and it's been working well. For vaccine court winners, that's true. For vaccine court losers, the fear was that these lawsuits would drive manufacturers out of the market, even if the manufacturers could win in the end. For a preemption provision to do any work, it needs to attach at the beginning of the claim. 22E, for example, refers to bringing an action. 22B1, to do any work to protect manufacturers, has to attach to prevent the cause of action from being brought. If it does — I'm still not clear what — I'm still not clear what answer you gave to Justice Ginsburg's question. You said, why didn't Congress put this out in plain words? There should be no liability for design. Is the answer sloppy drafting? Are you reluctant to give that answer? Well, Justice Kennedy, it could have been drafted a different way, and it would have meant the same thing. We think the best way to read the two clauses together, unavoidable even, though, is to refer to what comment K meant. Now, comment K used the term unavoidable. We know Congress was thinking about the term unavoidable. We know that because in the 1986 House report, the courts — the congressional committee says, we'd like to enact the principle of comment K. Well, what is the principle of comment K? The principle of comment K is that there are some products so useful that we want them to stay in the market without design defect liability. They can only be sued for manufacturing or warning defects. Those are the only two kinds of suits you can bring. In our view, comment K was Congress's denomination of vaccines as comment K. Sorry, 22B1 was the denomination of — Thank you, Ms. Sullivan. — as a comment K product. Thank you. Thank you. Mr. Horwich. Mr. Chief Justice, and may it please the Court. I think the Court finds itself actually three-quarters of the way through the argument without actually hearing about the most important Federal agency that's involved with this, which is arguably not the Food and Drug Administration, but the Centers for Disease Control and Prevention. And so with respect to the question about what is it that is governing whether the — whether the — whether the given vaccine is subject to the Act, and what are the incentives, and who's actually making the decision, and who's trying to determine if there's something better that's out there that we should be pursuing, that is the mission of the Centers for Disease Control and Prevention. That is why Congress took the original table — the vaccines that are on the original table in the statute were taken from CDC's recommendations that reflect CDC's expert scientific judgment based on the input from the medical and scientific community of what vaccines do we have that are the ones we should use to protect the public health. Do they get the information from the manufacturers? And, I mean, would they find out if, in fact, there had been a change and it was now — there was a safer alternative? Well, let me — let me give kind of — let me answer that in two ways. The first is that the — the nature of vaccine research is not something that manufacturers do in a cloistered laboratory somewhere. So it's actually very unlikely to imagine that a manufacturer somehow comes uniquely into possession of this knowledge. I mean, in fact, the Federal Government spends billions of dollars doing vaccine research that government scientists themselves perform. The government sets the agenda for what are our targets for development. The — the research agenda to pursue the Acellular pertussis vaccine was something driven by the Federal Government. Federal Government made a choice and said, we — we don't want manufacturers and our scientists pursuing the — the tri-sol-gen approach and trying to improve that. We don't understand that vaccine very well. We know the ultimate target needs to be development of an Acellular vaccine. And so that's the research path that the government is going on. Breyer. Suppose, then, that in — suppose I look into this, which I will do, the CDC and what they do, and suppose I become convinced you're completely right, that — that this is a government agency that's on top of this, and the chances of something going wrong are very small, and they'll figure it all out together with the manufacturer. Suppose I conclude that. What do I do about this word unavoidable? Now, I can't say that the word unavoidable — it's pretty hard to say that that word unavoidable means avoidable. And I am, in fact, like to look to the purposes of the statute, but if something says day, I can't say it means night. And so what is it about this word that allows us to say that it's avoidable? Well, I think the answer to that actually came in a question that Justice Ginsburg posed to Mr. Frederick, which is that unavoidable is being used in the sense of, okay, what are the vaccines that FDA has approved, that CDC has recommended for routine administration to children, and that are the ones that the Federal government has determined are appropriate, therefore, to protect the public health? And given that that's the state of affairs that we're in, was this injury? Breyer. To show that, remember, they only want to say, because of special circumstances, this is an avoidable, this is an avoidable injury. I think I'm right on that. And so the best place to look, in your opinion, for me to look, to show that this word unavoidable includes that avoidable claim, is where? I think the way to understand it is to see that, as the committee report, the 86th Committee report says, that what Congress is trying to convey in using the word unavoidable is that it is respecting the principle of comment K, which is the principle that socially beneficial products that nonetheless have these adverse effects ought to be on the market, and we ought not allow tort law to push them off the market, which is exactly what. Sotomayor, going back to the point you just started with, which was, is this, is the control disease center, is it making a judgment before it approves a drug for licensing that it's the most efficacious drug on the market? CDC does not issue a license. But the way the statute works is that the statute only covers, in its present form, the way the — and I'm referring now to the present version of the provision in the statute that explains how vaccines become subject to the Act, because not all vaccines are. The provision is in 14e of the Act, which I believe may not be reproduced in any of the papers, but it basically says that two things have to happen. One is that before the vaccine becomes subject to either the compensation program or the preemption provision, is that CDC has to recommend it for routine administration. And that is a judgment that CDC makes with the advice of the Advisory Committee on Immunization Practices. Sotomayor, where do I look at that, at what documents did I look at to make a judgment that in fact CDC is doing what I asked, that it is looking at the question of whether this is the most efficacious drug with the least adverse effects? Is that a judgment it's making? We know the FDA is not. Are you representing to us right now that CDC makes that judgment? Casey, CDC makes that judgment and announces it in a reasoned, published announcement in its official journal, which is the Morbidity and Mortality Weekly Report. And so for every drug — excuse me, for every vaccine that it recommends for routine administration, it publishes a notice in its journal explaining, this is, you know, these are the products that we are recommending for routine use, this is the studies, this is the development of them, this is our basis for this determination. And so it is not going to be. Sotomayor, that will include comparisons to other drugs on the market. Well, it's — there often won't be other drugs actually on the market to compare it to, but there will be — there will be a vast body of scientific literature that, again, is not exclusively within the manufacturer's control, because it's been produced by the Federal Government, by other countries' public health agencies, by academic scientists, that CDC will reference or its advisory committee will have incorporated in its recommendation. So it doesn't make a determination that the one that they are listing in their morbidity report is better than one that's out there? This is a situation where there were two of them out there. Well, there were not two out there, Mr. Chief Justice. At the time of this, there was — there were two forms of the vaccine out there. I'm sorry, if I can ask at what time you are referring to? Well, the comparison between the vaccine that caused the harm and the one that Mr. Frederick's client says was more efficacious and therefore the harms were avoidable. Right. And I'm not — I'm never— It's a situation where the Centers for Disease Control approve, alert people to the fact that there is a particular vaccine that they think manufacturers should produce, and there's another vaccine addressed to the same disease already on the market. That's never the case. They must approve the vaccine. We wouldn't have this case. Certainly they do. So when they publish that information in their weekly report, do they compare it, both with respect to losses, mortality, and with respect to efficiency, to the other vaccines on the market? Yes. Let me give you an excellent example of that, which is probably familiar to the Court, that there are two types of polio vaccines. There's the Sabin vaccine, which is associated with certain very rare but severe side effects, but which is extremely efficacious at protecting a population. And then there's the Salk vaccine, which is not associated with those same side effects, but which is not as effective at protecting a population. Now, CDC made a determination, and this was the determination in effect from the 1960s through the 1990s, that the Sabin vaccine, the one that is, quote, unquote, less safe, was the appropriate one for use because it better served the public health. Now, as polio — now, this is a dynamic process that CDC is continually engaged in, and so as polio approached global eradication and you're not as concerned about actual control of disease that's running in the community, CDC transitioned its recommendation to the Salk vaccine. So I think that answers the question that CDC is making determinations in this regard in a comparative way. And I think it would be extraordinary, then, to have juries — to have — to imagine that Congress set up a system in which juries would effectively be second-guessing decisions like that, because CDC has made the determination. It is not only given that information. It is also said in this weekly report that this is the one we want you to make. Yes. Now, I mean — If they're not lawyers, they're scientists. Correct. And so they may not use these exact words, but you're saying whatever word they're used, what they have is an ongoing process to say this is the best vaccine available. Is that right? Yes. And part of that ongoing process, as we described in our brief, is a unique system of monitoring and following up when there are adverse events. So we gave the example of the — The committees have manufacturers on them and government scientists and university people and others? I'm sorry? The committees have manufacturers and government scientists and university professors and others? My understanding is actually the manufacturers are relatively less represented on these committees, in the sense that the manufacturers are in some sense doing the manufacturing, but a lot of the research agenda is really driven by the Federal government. Thank you, counsel. Would you — would you explain one feature of this? It — there was the allegation that there were an unusual number of adverse reactions to the particular lot that this child's third vaccine came from, and that those adverse reactions were not disclosed to the doctors. And the doctor — this child's doctor said, if I had known about that unusual number of adverse reactions, I never would have used this vaccine. Is there any actionable claim for that, for not disclosing that there were a number of adverse — an unusual number of adverse reactions to this particular lot? If I may. Sure. Yes, absolutely there is, because that claim is either in the nature of a labeling claim or in the nature of a manufacturing defect claim. And the — the district court here and the court of appeals both treated that question not under preemption, but on the facts. A summary judgment in this case was granted purely on the absence of a disputed issue of material fact with effectual claims. Thank you, counsel. Mr. Frederick, you can take five minutes. Thank you. The only law cited by the government today was Section 14 of the Vaccine Act. It's not reproduced in the materials, but it is — the title of Section 14 is a vaccine injury table. It's about recommendations that the CDC makes as to which vaccines will be on the vaccine table, so that when the person goes through the vaccine court process, you can look and determine whether or not, on a no-fault basis, the vaccine is listed on the table or not listed on the table. Let me ask you this question about something that Mr. Horwich said. Under your understanding of this scheme, if a person suffered a very serious injury as a result of the Sabin vaccine during the period when the CDC recommended that over the Salk vaccine, would the — would the injured person have a claim for design defect if the person could produce experts who said the CDC was wrong, that they should never have made this recommendation? It's not that the CDC would be wrong, Justice Alito. There's a difference between strict liability and a no-fault arrangement and where negligence would be asserted that a reasonable manufacturer would have come forward with information about a safer design. So what Congress explicitly rejected, and they voted this down in the Energy and Commerce Committee, was a regulatory compliance defense solely on the basis that the FDA had approved the design. Alito, this might be what Congress wanted, and it might be the better policy, but your answer to my question is that that would permit a lay jury to say, relying on experts produced in court, the CDC got this wrong, the Salk vaccine was really the better one. It was a design defect. Yes. Yes, that would be a viable design defect claim. And let me give you an example right out of the Joint Appendix in this case. In 1965, Letterley's researchers determined that Lilly, the trisulgin, had a, quote, superior product. That's at page 245 of the Joint Appendix. In 19 — that was in 1967. Eight years later, the internal scientists at Letterley wrote a memo to the head of Letterley and said, We recommend that we approach Lilly for its pertussis vaccine process and or continue to bid on foreign contracts for this product line with the intent of increasing volume. They had made the determination they were not capable internally of doing a safer design, and they knew that for eight years, and they nonetheless kept the wholesale pertussis in its market, and the documents in this case indicate they did it for economic reasons. And the whole idea behind having design defect claims is to put manufacturers to the duty of putting out safest possible products in light of what the science holds. The CDC — there are no regulations that the government cites in its brief or today saying that the CDC does the kind of comparative analysis for safety that is provided under State law design defect claims. Breyer, their argument is that the CDC will do it better than juries. That's what I heard him say. And, Justice Breyer, there are now six DTAP vaccines on the market that CDC doesn't distinguish between them, but if it comes to pass, that the science would indicate that one of them was woefully not as safe. And here, you know, their argument is that the vaccine industry is going to go out of business. This vaccine that's at issue in this case was taken off the market in 1998. So it seems to me that the CDC does compare new vaccines to the ones that are out on the market. He cited no law in Washington. So you think he was incorrect in that assertion? I'm not going to say this is better than the one that's out there, or they're not. Yes. And if you compare that to what Congress wrote in the statute, our submission is that Congress's words in section 22 take precedence. Because they're not. No, I'm just trying to find out what your position is on that. Do they compare it to existing vaccines or not? We found no law that gives the CDC the authority to do that. I'm not asking about law. I'm asking a matter of fact. Whether. Do you open up this weekly report? I'm not. I'm sorry, Mr. Chief Justice. Do you open up the weekly report and it says this new vaccine is better than the one that's out there or not? I'm not aware that the CDC does the kind of granular comparisons that would go to a level of safety that is at issue in this kind of case. And that's what's important here. We're talking about trying to eliminate some of the most horrifying and horrible incidents of injury through vaccines that we compel children to take. And the whole idea behind Congress's scheme was to balance having vaccine supply available with providing a generous form of compensation to those persons who would be injured. Thank you, counsel. And so the case is submitted. The honorable court is now adjourned until tomorrow at 10 o'clock.